STEPTOE & JOHNSON LLP
Collier Center
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile: (602) 257-5299

P. Bruce Converse (5868)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allstate Insurance Company,<br><br>Plaintiff,<br><br>vs.<br><br>Stephen E. Ehlers and Heidi E. Wahlmark Ehlers, a married couple,<br><br>Defendants. | No.<br><br>**COMPLAINT**<br><br>**(Violation of Lanham Act, violation of state trademark statute, violation of Arizona consumer protection statute, breach of contract, misappropriation of trade secrets, and tortious interference with contract)** |

Plaintiff Allstate Insurance Company ("Allstate"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendant Stephen E. Ehlers ("Ehlers") and Heidi E. Wahlmark Ehlers, his wife:

## NATURE OF THE ACTION

1. This action is the result of Defendant Ehlers failing to comply with certain promises he made and obligations he owes to Allstate. Specifically, Ehlers executed an "Allstate R3001S Exclusive Agency Agreement" ("EA Agreement") with Allstate on December 1, 2009 (attached as Exhibit A). The EA Agreement allowed Ehlers to become an Exclusive Allstate Agent and to sell and receive monies from Allstate products and services (jointly, "products").

2. Under the EA Agreement, Ehler agreed that, for one year following the termination of his relationship with Allstate, he would not solicit Allstate customers that

he sold Allstate products to and who were Allstate customers at the time the EA Agreement terminated for one year following the termination of his relationship with Allstate.

3. The EA Agreement further required Ehlers to acknowledge that he would be granted access to Allstate confidential information, that Allstate confidential information is the property of Allstate, and that he would not disclose to any third party or permit any third party to access Allstate confidential information, except upon direct written authority of Allstate.

4. Ehlers also agreed to return all Allstate property, including Allstate confidential information, upon termination of his relationship with Allstate.

5. On or about September 10, 2013, Ehlers' EA Agreement and his relationship with Allstate terminated. Since that date, Ehlers has been operating an insurance agency, InsuranceAZ, LLC ("InsuranceAZ") which sells products competitive to those offered and sold by Allstate.

6. Upon information and belief, Ehlers used, and is continuing to use, Allstate confidential information to solicit Allstate customers previously serviced by Ehlers' Allstate agency to purchase competing products from InsuranceAZ.

7. In addition, and in further breach of his EA Agreement, Ehlers is fraudulently holding himself out as being affiliated with Allstate. Since his EA Agreement and relationship with Allstate terminated, Ehlers has continued to maintain a website, www.steveehlersallstate.com, and an email address, steve@steveehlersallstate.com, that falsely represent Ehlers being affiliated with Allstate.

8. Ehlers is using the Allstate email address to solicit Allstate customers formerly serviced from his Allstate agency and is maintaining the www.steveehlersallstate.com website to direct Allstate customers and potential Allstate customers to InsuranceAZ. Ehlers' conduct is causing customers to become confused as to who is authorized to sell Allstate products, damaging Allstate's reputation and

customer goodwill, and causing Allstate damages from the loss of customers to Ehlers and InsuranceAZ.

9. Ehlers' actions are a clear violation of his EA Agreement, the Lanham Act, and common law. Consequently, Allstate now brings suit against Ehlers for violation of the Lanham Act, violation of the Arizona Registration and Protection of Trademarks and Service Marks Act, violation of the Arizona Consumer Fraud Act, breach of contract, misappropriation of trade secrets, and tortious interference. In doing so, Allstate requests that this Court enter an order enjoining Ehlers from continuing his knowing and intentional breach of his EA Agreement, and award Allstate compensatory and punitive damages for Ehlers' intentional and illegal acts.

10. Accordingly, Allstate respectfully requests that this Court enter an order (1) enjoining Ehlers, and anyone acting in concert with him, from representing himself as an Exclusive Allstate Agent or in any way representing himself as being affiliated with Allstate, (2) enjoining Ehlers, and anyone acting in concert with him, from using the website www.steveehlersallstate.com and the email address steve@steveehlersallstate.com, (3) enjoining Ehlers, and anyone acting in concert with him, from violating his EA Agreement, including soliciting Allstate customers who were customers of Ehlers' Exclusive Allstate Agency or customers whom Ehlers knew about through his Exclusive Allstate Agency, (4) compelling Ehlers to return to Allstate all Allstate property, including all Allstate confidential information, in his custody, possession or control, (5) awarding Allstate compensatory and punitive damages for Ehlers' intentional acts, and (6) awarding Allstate its reasonable attorneys' fees as provided for under the EA Agreement and applicable law.

**THE PARTIES AND RELEVANT PERSONS**

11. Allstate Insurance Company ("Allstate") is an Illinois corporation with its principal place of business located in Northbrook, Illinois.

12. Stephen E. Ehlers ("Ehlers") is a citizen of the State of Arizona and resides at 4094 E. Del Rio Street, Gilbert, Arizona, 85295.

13. Upon information and belief, Ehlers and Heidi E. Wahlmark Ehlers are husband and wife, and all acts of Ehlers alleged herein were for and on behalf of both Ehlers individually and the marital community of Ehlers and Heidi E. Wahlmark Ehlers.

14. Non-party InsuranceAZ, LLC ("InsuranceAZ") is an Arizona limited liability company with a principal place of business located at 6938 East Parkway Norte #3, Mesa, Arizona, 85212. Upon information and belief, Ehlers is the sole member of InsuranceAZ.

## JURISDICTION AND VENUE

15. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because this action and controversy is between citizens of different states and exceeds the sum or value of $75,000.00, exclusive of interest and costs. The Court also has jurisdiction under 28 U.S.C. § 1331 because claims arise under federal law. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because such claims derive from a common nucleus of operative facts with the claims under federal law.

16. This Court has personal jurisdiction over Ehlers because he is a citizen and resident of Arizona. Venue is proper in the United States District Court for the District of Arizona, pursuant to 28 U.S.C. § 1391(b), because Ehlers resides in this District, the Allstate property Allstate seeks to be returned is located in this District, and a substantial part of the events giving rise to Allstate's claims occurred in this District.

## BACKGROUND

### Allstate's Business and Hiring of Independent Agents

17. Allstate is one of the nation's leading providers of insurance products to individuals and businesses. Among other things, Allstate provides automobile insurance, property and casualty insurance, and life insurance to individuals and businesses.

18. In addition to providing these products directly, Allstate appoints independent exclusive agents ("Exclusive Agents"), through its Exclusive Agency Program, to sell Allstate products.

19. Allstate rigorously screens its Exclusive Agents to ensure that the agents are qualified to represent and sell Allstate products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate insurance solutions.

20. Allstate expends substantial resources advertising, marketing and promoting its products.

21. Among other things, Allstate advertises, markets and promotes its products through the use of the Allstate name, which is a federally registered service mark in connection with the sale of insurance products ("ALLSTATE").

22. The service mark ALLSTATE has been used for well over five continuous years by Allstate

23. The service mark ALLSTATE is widely-recognized in the public and in Arizona as a service mark for Allstate.

24. Use of the ALLSTATE service mark distinguishes the products Allstate offers from Allstate competitors and other insurance providers.

25. The Exclusive Agents benefit directly and indirectly from Allstate's advertising, marketing and promotion efforts, as well as from Allstate's goodwill, reputation and name recognition. These efforts and expenditures allow the Exclusive Agents to develop and cultivate customer accounts and relationships on behalf of Allstate.

26. Allstate relies heavily upon repeat business and renewal of policies to maintain its competitive advantage in the highly competitive insurance industry. Maintaining goodwill and a solid business reputation with its customers and insureds is a critical component of Allstate's success. Indeed, because Allstate's business is a service business, the relationship that each Exclusive Agent has with Allstate customers

is highly dependent on the attention and excellent service given to the customers on an ongoing basis, and the continued trust the customers place in Allstate as a leading provider of such services.

**Protection of Allstate Confidential Information**

27. Allstate and its customers entrust Allstate and its Exclusive Agents to safeguard and protect their private information, which includes information relating to, among other things, their personal data, date of birth, social security numbers, types of policies, amount of insurance, premium amounts, description and location of assets and property, claims histories, insurance needs, pricing information, and other insurance coverage information, from unauthorized use or disclosure.

28. Allstate protects its information (described in paragraph 26) by, among other things: limiting the disclosure and use of this information to only the Exclusive Agent who needs this information to sell Allstate products; educating the Exclusive Agent about the requirement and necessity of keeping this information confidential; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the Exclusive Agent to execute written agreements that protect against the misuse and improper disclosure of Allstate’s confidential information.

29. Consequently, all Exclusive Agents, pursuant to their agreements with Allstate and while performing services under their agreements, acknowledge that they will have access to Allstate confidential information, promise to not disclose confidential information to anyone not authorized to receive it, and confirm that they will not use confidential information for their own benefit or for any improper purpose.

30. Exclusive Agents agree, upon termination of their relationship with Allstate, to continue treating Allstate confidential information as confidential, not disclose, either directly or indirectly, Allstate confidential information to any third party, and immediately return all Allstate confidential information to Allstate.

31. Hence, Allstate's confidential and proprietary information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive insurance business.

**Ehlers Enters into EA Agreement to Solicit and Sell Allstate Products**

32. After proceeding through Allstate's rigorous screening process to become an Exclusive Agent, Ehlers became an Exclusive Allstate Agent on or about December 1, 2009. (See EA Agreement, Ex. A hereto.)

33. Ehlers operated an Allstate agency from 743 S Lindsay Road, Suite 103, Gilbert, Arizona, 85296.

34. Under his EA Agreement, Ehlers acknowledged that the following information is Allstate's "confidential information" and property:

> business plans of [Allstate]; information regarding the names, addresses, and ages of policyholders; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by [Allstate] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of [Allstate] that is not otherwise lawfully available to the public. All such confidential information is wholly owned by [Allstate]. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

(EA Agreement, § IV(D).)

35. Pursuant to Section IV(D) of the EA Agreement, Ehlers agreed that he will not at any time or in any manner, directly or indirectly, use any Allstate confidential information for "[his] own benefit." (EA Agreement, § IV(D).)

36. Pursuant to Section IV(D) and XVIII(B) of the EA Agreement, Ehlers acknowledged that all confidential information he was provided and had access to would

at all times remain Allstate property and was to be returned upon termination of his EA Agreement and relationship with Allstate. (EA Agreement, §§ IV(D), XVIII(B).)

37. Ehlers recognized that a breach of any of the provisions in his EA Agreement would "cause irreparable damage to [Allstate's] business and that such damage will be difficult or impossible to measure." (EA Agreement, §§ IV(F), XVIII(F).)

38. Accordingly, Ehlers agreed that if he breached any of the obligations under the EA Agreement, then Allstate would be "entitled to an order granting injunctive relief from any court of competent jurisdiction" in addition to other rights and remedies. (*Id.*)

39. Ehlers also agreed that Allstate would be "entitled to an award of reasonable attorneys' fees in the event that [Allstate] is successful in an application for injunctive relief or in an action based upon the breach" of any of the terms set forth in the EA Agreement. (*Id.*)

**Ehlers Breaches His Allstate EA Agreement**

40. On or about September 10, 2013, Ehlers' EA Agreement was terminated.

41. After his relationship with Allstate terminated, Ehlers promised to (a) immediately return all property belonging to Allstate; (b) cease and desist from representing himself as in any way affiliated with Allstate; (c) cease and desist from any and all use of Allstate service marks and trade names, and (d) not solicit the purchase of products or services in competition with Allstate to any customer of Allstate as of September 10, 2013. (EA Agreement, § XVIII(A), (B), (D), (E).)

42. In connection with the termination of the EA Agreement, Ehlers received payments from Allstate relating to the value of the book of Allstate business previously serviced by Ehlers' agency ("Termination Payments"). To date, those payments have totaled $97,520.66.

43. Ehlers' entitlement to receive Termination Payments are expressly conditioned on Ehlers' compliance with the post-termination obligations in the EA Agreement.

44. After the termination of Ehlers' EA Agreement, Ehlers opened the InsuranceAZ insurance agency, located at 6938 East Parkway Norte #3, Mesa, Arizona, 85212. InsuranceAZ sells products competitive to those offered by Allstate.

45. In or about October 2013, Allstate learned that Ehlers was emailing Allstate customers previously serviced by Ehlers' Exclusive Allstate Agency from the steve@steveehlersallstate.com email address to solicit the purchase of products competitive to those offered by Allstate from InsuranceAZ.

46. In addition, Allstate learned that Ehlers was continuing to use the website www.steveehlersallstate.com to direct Allstate customers and potential Allstate customers to InsuranceAZ's website, http://phoenixinsurancebroker.net/.

47. Consequently, on November 1, 2013, Allstate sent correspondence to Ehlers at his home and office demanding that Ehlers immediately cease soliciting Allstate customers and to immediately return all Allstate confidential and proprietary information. A copy of Allstate's November 1, 2013 letter is attached as Exhibit B.

48. Ehlers did not respond to Allstate and, as such, continued to illegally and improperly use Allstate confidential information as well as the Allstate service mark and trade name.

49. Since November 1, 2013, Allstate continued to experience customer losses to the InsuranceAZ agency. Upon information and belief, Ehlers is continuing to use Allstate confidential information to solicit Allstate customers to terminate their relationship with Allstate and purchase competing products.

50. Ehlers is also continuing to use the website www.steveehlersallstate.com to direct Allstate customers and potential customers to InsuranceAZ's website, http://phoenixinsurancebroker.net/.

51. Since September 10, 2013, when Ehlers' EA Agreement terminated, Allstate has lost a substantial number of customers previously serviced by Ehlers' Exclusive Allstate Agency and the corresponding revenues from those customers' Allstate products.

52. On April 14, 2014, Allstate sent a second demand to Ehlers, demanding that he abide by the obligations set forth in his EA Agreement, stop soliciting Allstate customers, stop utilizing Allstate confidential information and trade secrets, stop using the steve@steveehlersallstate.com email address, disable the www.steveehlersallstate.com website, and immediately return all Allstate information and property to Allstate. (Allstate's April 14, 2014 demand to Ehlers is attached as Exhibit C.)

53. Ehlers failed to respond to Allstate's November 1, 2013 and April 14, 2014 letters.

54. Consequently, Ehlers refuses to honor his obligations under his EA Agreement, continues to use Allstate confidential information to solicit Allstate customers, continues to solicit Allstate customers that he sold Allstate products to and who were Allstate customers at the time his EA Agreement terminated, continues to represent himself as being affiliated with Allstate by emailing Allstate customers from the steve@steveehlersallstate.com email address to solicit the purchase of products competitive to those offered by Allstate, and using the website www.steveehlersallstate.com to direct Allstate customers and potential customers to InsuranceAZ's website, http://phoenixinsurancebroker.net/.

55. Ehlers' conduct violates Sections IV(B), XVIII(A), (B), (D), and (E) of the EA Agreement and other applicable laws.

**Irreparable Harm to Allstate**

56. By violating his EA Agreement, Ehlers is harming Allstate's legitimate business interests by illegally diverting customers and potential customers away from Allstate.

57. Ehlers is also harming Allstate's legitimate business interests by soliciting former Allstate customers (customers who were Allstate customers at the time Ehlers' EA Agreement terminated) with competitive products.

58. By using an email address and website with the ALLSTATE trade name, Ehlers is creating confusion among Allstate customers and potential customers as to Ehlers' affiliation with Allstate and is misappropriating Allstate's goodwill to solicit business competitive to Allstate.

59. Moreover, Allstate's trade secrets, confidential information and goodwill are at risk because Ehlers is unfairly competing with Allstate and refusing to return Allstate's property.

60. Accordingly, Allstate is suffering irreparable harm and injunctive relief is necessary and appropriate to prevent further damage to Allstate.

**COUNT I**
**Violation of Lanham Act, 15 U.S.C. § 1125, et seq.**

61. Allstate incorporates by reference paragraphs 1 through 60 of the Complaint, as though fully stated herein.

62. The ALLSTATE service mark is a protectable mark under federal law.

63. Ehlers is intentionally and willfully using the ALLSTATE trade name and service mark without authorization from Allstate to falsely represent to the public and Allstate customers that he is affiliated with Allstate.

64. Ehlers' false representations to the public and Allstate customers caused, and is continuing to cause, confusion, mistake, and deception as to the affiliation, connection, or association of Ehlers with Allstate.

65. By engaging in misleading conduct, Ehlers caused Allstate customers to purchase products competitive to those offered by Allstate and, upon information and belief, has caused customers and potential customers seeking information about Allstate products to receive information about products that are competitive with Allstate products.

66. By falsely representing himself as being affiliated with Allstate, Ehlers has caused, and will continue to cause, confusion, mistake or deception resulting in customers and potential customers of Allstate terminating their relationship with Allstate or deciding not to purchase Allstate products.

67. By falsely representing himself as being affiliated with Allstate, Ehlers is damaging Allstate's reputation and customer goodwill in violation of the Lanham Act, 15 U.S.C. § 1125.

68. As a result of Ehlers' violation of the Lanham Act, Allstate has been damaged in an amount to be determined at trial.

**COUNT II**
**Violation of Arizona Registration and Protection of Trademarks and Service Marks Act, A.R.S. § 44-1441, et seq.**

69. Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 68 of the Complaint, as if fully set forth herein.

70. The ALLSTATE service mark is well-recognized and famous in the State of Arizona.

71. Ehlers is intentionally and willfully using the ALLSTATE trade name and service mark without authorization from Allstate to falsely represent to the public and Allstate customers that he is affiliated with Allstate.

72. Ehlers' false representations to the public and Allstate customers caused, and is continuing to cause, confusion, mistake, and deception as to the affiliation, connection, or association of Ehlers with Allstate.

73. By engaging in misleading conduct, Ehlers caused Allstate customers to purchase products competitive to those offered by Allstate and, upon information and belief, has caused customers and potential customers seeking information about Allstate products to receive information about products that are competitive with Allstate products.

74. By falsely representing himself as being affiliated with Allstate, Ehlers has caused, and will continue to cause, confusion, mistake or deception resulting in customers and potential customers of Allstate terminating their relationship with Allstate or deciding not to purchase Allstate products.

75. By falsely representing himself as being affiliated with Allstate, Ehlers is damaging Allstate's reputation and customer goodwill in violation of the Arizona Registration and Protection of Trademarks and Service Marks Act, A.R.S. §44-1441, et seq.

76. As a result of Ehlers' violation of the Arizona Registration and Protection of Trademarks and Service Marks Act, Allstate has been damaged in an amount to be determined at trial.

**COUNT III**

**<u>Violation of Arizona Consumer Fraud Act, A.R.S. § 44-1521, et seq.</u>**

77. Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 76 of the Complaint, as if fully set forth herein.

78. By using the ALLSTATE service mark and trade name, Ehlers is willingly and knowingly falsely representing himself as affiliated with Allstate, as licensed to sell Allstate products, and as authorized to service existing Allstate customers.

79. Ehlers' false representations and conduct were knowingly made in connection with the sale and servicing of insurance products.

80. Ehlers' false representations and conduct occurred in the regular course of Ehlers' operation of his InsuranceAZ insurance agency.

81. Ehlers' false representations and conduct deceived and continues to deceive persons by creating the belief that Ehlers is affiliated with Allstate, licensed to sell Allstate products, and authorized to service existing Allstate customers.

82. As a result of Ehlers' violation of the Arizona Consumer Fraud Act, Allstate has been damaged in an amount to be determined at trial.

**COUNT IV**
**Breach of Contract**

83. Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 82 of the Complaint, as if fully set forth herein.

84. On December 1, 2009, Ehlers entered into his EA Agreement with Allstate.

85. The EA Agreement is a valid and enforceable contract.

86. Under the EA Agreement, Ehlers promised, for a period of one year following the termination of the EA Agreement, to not solicit the purchase of products competitive with those sold by Allstate to any person, company, or organization that Ehlers sold Allstate products to and who was an Allstate customer at the time the EA Agreement terminated.

87. Under the EA Agreement, Ehlers also promised that, upon termination of the EA Agreement, he would immediately return all property belonging to Allstate.

88. Ehlers further promised to not use Allstate confidential information for any purpose other than carrying out the provisions of the EA Agreement.

89. At the time his EA Agreement terminated, Ehlers promised to immediately cease and desist from any and all use of Allstate service marks and trade names.

90. The post-termination covenants found in the EA Agreement are reasonable in scope and duration, and are necessary to protect Allstate's legitimate business interests in its confidential information, goodwill, service marks and trade names, and longstanding customer relationships.

91. Allstate has performed all of the duties and obligations it owes Ehlers under the EA Agreement.

92. Ehlers breached his EA Agreement, and continues to breach his EA Agreement, by, among other things, misusing Allstate confidential information to solicit Allstate customers for the benefit of his InsuranceAZ insurance agency, soliciting

Allstate customers that he sold Allstate products to and who were Allstate customers when the EA Agreement terminated, continuing to use an email address and website that contain the Allstate name and mark, and by refusing to return all property belonging to Allstate.

93. Allstate has incurred significant damage as a result of Ehlers' breach of the EA Agreement. Specifically, Allstate has paid Ehlers $97,520.66 in Termination Payments conditioned on Ehlers' compliance with the post-termination provisions of the EA Agreement and suffered the loss of customers and potential customers. Ehlers' illegal solicitations and actions have also caused Allstate to lose customers and potential customers, and have also damaged Allstate's goodwill, reputation, and legitimate business interests. Allstate's above damages are in excess of $75,000.00.

94. Moreover, Ehlers' breaches of the EA Agreement are continuing. Allstate is therefore subject to continuing irreparable harm, economic injury, and damage to its goodwill and business reputation.

95. Allstate has no adequate remedy at law and, unless injunctive relief is granted, Allstate will continue to be irreparably harmed by Ehlers' breach of his EA Agreement in a manner that is not fully compensable by money damages.

96. Allstate therefore requests that this Court grant injunctive relief against Ehlers that prohibits Ehlers from using Allstate confidential information, from using any email address or website containing the ALLSTATE service mark and trade name, and prior to September 11, 2014, soliciting Allstate customers that Ehlers sold Allstate products to and who were Allstate customers when the EA Agreement terminated.

97. Allstate further requests that this Court order Ehlers to immediately return all Allstate property in the custody, possession, or control of Ehlers.

98. Finally, and pursuant to Sections IV(F) and XVIII(F) of the EA Agreement, Allstate is entitled to recover the attorneys' fees and costs Allstate incurs as a result of Ehlers' breaches of the EA Agreement.

**COUNT V**
**Misappropriation of Trade Secrets**

99. Allstate repeats and re-alleges each and every allegation contained in paragraphs 1 through 98 of the Complaint, as if fully set forth herein.

100. During the course of his relationship with Allstate, Ehlers was exposed to substantial amounts of Allstate's confidential information.

101. For instance, Ehlers had access to: Allstate business plans; information regarding the names, addresses, and ages of policyholders or prospective policyholders of Allstate; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings; policyholder information that is subject to privacy law; and claim information.

102. This information is not available to the general public and is closely guarded by Allstate. Allstate keeps such information strictly confidential in order to protect its customers' privacy and to maintain a competitive advantage in the highly competitive insurance business.

103. This information is considered a trade secret under the Arizona Uniform Trade Secrets Act ("AUTSA"), A.R.S. § 44-401, et seq., because Allstate derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

104. The economic value of the Allstate trade secrets/confidential information Ehlers had access to under the EA Agreement is over $1 million.

105. Under the AUTSA, "actual or threatened misappropriation [of trade secrets] may be enjoined." A.R.S. §44-402.

106. Ehlers is misappropriating Allstate trade secrets by refusing to return Allstate property, including Allstate confidential information, and using that information to solicit Allstate customers.

107. Upon information and belief, Ehlers' refusal to return Allstate property, including Allstate confidential information, constitutes the "threatened" misuse of Allstate trade secrets and injunctive relief is therefore appropriate.

108. Accordingly, Allstate requests that this Court enter an order enjoining Ehlers from using any Allstate confidential information, including at the InsuranceAZ agency, and from disclosing Allstate confidential information to anyone not authorized to receive the confidential information.

109. Allstate also requests that this Court enter an order requiring Ehlers to return any and all Allstate confidential information to Allstate, as he is required to do pursuant to his EA Agreement.

110. Allstate further requests an award of its compensatory damages, as well as exemplary damages under A.R.S. § 44-403 and its attorneys' fees under A.R.S. § 44-404 because Ehlers' misappropriation of Allstate trade secrets was willful and malicious.

**COUNT VI**
**Tortious Interference**

111. Allstate repeats and realleges each and every allegation contained in paragraphs 1 through 110 of the Complaint, as if fully set forth herein.

112. Ehlers was and is aware of the contractual relationship between Allstate and Allstate's customers, as well as Allstate's expectancy in developing relationships with potential customers.

113. Ehlers knew and understood that Allstate's contractual relationship with its customers would continue after Ehlers' EA Agreement terminated.

114. Pursuant to his EA Agreement, Ehlers was obligated not to solicit or otherwise interfere with Allstate's customer relationships for a period of one year after the termination of his respective Allstate Agreements.

115. Nevertheless, Ehlers contacted Allstate customers after his EA Agreement terminated to have Allstate customers terminate their relationships with Allstate.

116. Hence, Ehlers knowingly, intentionally, and willfully interfered with Allstate's customer relationships.

117. Ehlers' conduct was not privileged or justified.

118. Allstate has incurred significant damages as a result of Ehlers' interference with Allstate's contractual relationships. Allstate has suffered the loss of customers and potential customers. Ehlers' actions have also damaged Allstate's goodwill, reputation, and legitimate business interests.

119. Allstate is therefore entitled to recover compensatory damages and interest in an amount to be proven at trial for Ehlers' tortious interference.

**WHEREFORE**, Plaintiff Allstate Insurance Company respectfully requests that this Court:

1. Enter an injunction enjoining and restraining Ehlers, and his agents, representatives, associates, employees, and all those acting in concert or participation with him, from:

(a) prior to September 11, 2014, soliciting Allstate customers that he sold Allstate products to and who were Allstate customers at the time his EA Agreement terminated;

(b) using any Allstate confidential information for his own benefit and from disclosing Allstate confidential information to anyone not authorized to receive the information.

2. Enter an order requiring Ehlers to return all Allstate confidential information in his possession or control to Allstate.

3. Enter an order requiring Ehlers to immediately desist from using the ALLSTATE service mark and trade name, including in any email address, website, or communications.

4. Enter judgment against Ehlers for compensatory damages in an amount to be determined at trial;

5. Enter judgment against Ehlers for punitive damages in an amount to be determined at trial;

6. Award Allstate the costs and expenses, including reasonable attorneys' fees, Allstate incurs as a result of Ehlers' breach of his EA Agreement and under A.R.S. § 44-404; and A.R.S. § 44-1451

7. Award Allstate such other relief as the Court may deem just and proper.

DATED this 3rd day of July, 2014.

STEPTOE & JOHNSON LLP

By /s/P. Bruce Converse
P. Bruce Converse
201 East Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

SEYFARTH SHAW LLP
J. Scott Humphrey (To be admitted *pro hac vice*)
Illinois State Bar No. 6239169
Marcus L. Mintz (To be admitted *pro hac vice*)
Illinois State Bar No. 6290255
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
Phone: 312-460-5000
Fax: 312-460-7000
shumphrey@seyfarth.com
mmintz@seyfarth.com

*Attorneys for Plaintiff Allstate Insurance Company*

**Index of Exhibits –**
**Complaint - Filed 7/3/14**

A. Allstate R3001S Exclusive Agency Agreement dated December 1, 2009

B. Allstate's November 1, 2013 letter

C. Allstate's April 14, 2014 demand to Ehlers

# Exhibit A

# ALLSTATE R3001S EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and Steve Ehlers (referred to in this Agreement as "you").

The Company and you agree as follows:

I. AUTHORITY:

A. Effective Dec 1, 2009, the Company appoints you as its agent to represent the Company in the Exclusive Agency Program. You are authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of AZ as the Company may from time to time authorize to be written. You are also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business"). The Company will own all business produced under the terms of this Agreement. You will not represent yourself as having any authority other than that specifically granted to you by the Company. You will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B. This Agreement is the sole and entire agency agreement between the Company and you, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and you. This Agreement also supersedes any prior oral statements and representations by the Company to you and any prior written statements and representations by the Company to you in letters, manuals, booklets, memoranda, or any other format.

C. The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to you, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D. You are an independent contractor for all purposes and not an employee of the Company. You will have full control of your time and the right to exercise independent judgment as to the time, place, and manner of performing your duties, which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards. You will not represent that you have authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E. You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. You may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.



EXHIBIT A

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;
2. The acceptance or rejection of any application;
3. The termination or modification of any contract or the refusal to renew any contract;
4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;
5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and
6. The type and quality of customer service received by Company policyholders.

II. DUTIES AND CONDITIONS:

A. You will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, you will provide customer service, including the collection of payments, for any and all Company policyholders and you will assist in claims administration in accordance with the Company's rules and procedures.

B. You will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. You will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. You will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. You agree to maintain any required agent license in the state or states in which you are appointed to represent the Company and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting your operation.

E. The Company recognizes that you may, in your sole discretion, arrange to have business conducted at your sales location in your absence by your own employees or other persons and that the time during which you are physically present at your sales location is entirely in your sole discretion. You must, however, remain actively involved in the conduct of business at your sales location.

F. You agree that the Company will have the authority to use your name and signature, or facsimile thereof, on policy documents and customer communication materials.

G. You agree to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. You also agree that, because you are conducting business with the public under the Allstate name, Company representatives shall be permitted access to your agency to review compliance with this Agreement during agency business hours.



EXHIBIT A

H. You agree that, as requested by the Company, you will demonstrate your knowledge of the Company products you are authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting your operation. If you are unable to demonstrate your knowledge of any product, the Company reserves the right to deny you the authority, or withdraw your existing authority, to sell that product until you demonstrate such knowledge.

III. YOUR EMPLOYEES:

A. You have no authority to employ persons on behalf of the Company, and no employee of yours will be deemed to be an employee or agent of the Company, such employees at all times remaining your employees. You have sole and exclusive control over your labor and employee relations policies, and your policies relating to wages, hours, and working conditions of your employees. You have the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge your employees.

B. You are solely responsible for all salaries and other compensation of all your employees and will make all necessary salary deductions and withholdings from your employees' salaries and other compensation. You are solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of your employees.

C. You will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding your employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, your warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. You agree and warrant that your employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

IV. COMPANY PROPERTY, CONFIDENTIALITY:

A. The Company will furnish you such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist you. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at your expense, such additional materials and supplies as the Company feels may be helpful to you.

B. You agree that you will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, you agree to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. You agree that you will not disclose or grant access to any confidential information or trade secrets to any of your employees or other persons providing services for you in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement attached as Appendix A. Appendix A is a sample copy of the electronic version of the document that must be transmitted to the Company.



**EXHIBIT A**

D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by you only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by you, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

V. **SALES LOCATION:**

A. You may select your sales location, within a geographical area specified by the Company, subject to Company approval. Initially, you have selected the location at 1929 E. Ray Rd. Ste 1 Chandler, AZ 85225 and such sales location has been approved by the Company. You agree that you will not establish any additional sales location without the prior written approval of the Company. You understand that you have no exclusive territorial rights in connection with your sales location.

B. You agree to keep your sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, you agree to operate your sales location consistently with the Agency Standards.

C. You are authorized to sell insurance offered by the Company and Company Business only in the state containing your sales location and other states in which you are properly licensed and appointed as an agent by the Company.

VI. **ADVERTISING:**

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. You may also advertise in your sole discretion, subject to the requirements in paragraph B. below.

B. You will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. You will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to



**EXHIBIT A**

conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

VII. **SERVICE MARK AND TRADE NAME PROTECTION:**

A. You agree to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which you may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which you use any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require you to institute appropriate procedures to correct any deficiencies noted by the Company.

B. You agree, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which you may then be using.

C. You will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes you to use in the performance of this Agreement, except as permitted in Section XVI.

D. You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

VIII. **EXPENSES:**

You will be responsible for the payment of all expenses that you incur in the performance of this Agreement including, but not limited to: expenses for your sales location, supplies not furnished by the Company, compensation of your employees or other assisting persons whom you engage, telephone, postage, and advertising expenses incurred at your direction, and all other charges and expenses.

IX. **TELEPHONE:**

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

X. **INDEMNIFICATION:**

A. The Company will defend and indemnify you against liability, including the cost of defense and settlements, imposed on you by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that you have not caused or contributed to cause such liability by your acts or omissions. You agree, as a condition to such indemnification, to notify the Company promptly of any claim or suit against you and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent. The Company reserves the right to select counsel to represent you in connection with any such claim or suit. You also agree to cooperate fully with the Company in any such investigation, settlement, or defense.



**EXHIBIT A**

B. You will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by your acts or omission, or those of any employee or other person working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify you promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

XI. INSURANCE:

A. You agree that you will, at your sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

C. You must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise you, and if you do not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at your expense and deduct the cost of such insurance plus a processing fee from monies owed you by the Company.

XII. FINANCIAL INFORMATION:

You shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during normal agency hours without notice by the Company or its designated auditors and you shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

XIII. POLICIES IN YOUR ACCOUNT:

Policies which are credited to your account are described in the Supplement. While this Agreement is in effect, the Company will leave in your account all policies credited to your account so long as the policyholder resides within a state in which you are licensed and appointed by the Company, except that the Company may remove any policy from your account at the request of a policyholder.

XIV. MONEY COLLECTED BY YOU:

All payments collected or received by you in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. You must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.



EXHIBIT A

XV. COMPENSATION:

A. The sole compensation to which you will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. The Company will pay you your commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide you with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B. The Company may provide you with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C. If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to you, or if any premium paid is not earned by the Company, the commissions paid to you on the amount returned or credited to the policyholder, or the amount overpaid to you, will constitute an indebtedness of yours to the Company and will be charged to you or recovered from you by reducing any future commissions, awards, or bonuses due you.

XVI. TRANSFER OF INTEREST:

A. This Agreement is personal to you and is being entered into in reliance upon and in consideration of your skills, qualifications, and representations. Accordingly, you may not execute a transfer of your interest in this Agreement or any interest in the business under this Agreement including, but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. You have the obligation to notify the Company of a proposed transfer and to request Company approval.

B. You have an economic interest, as defined in this Agreement and the Incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement. Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, you may transfer your entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of your interest in this Agreement or any interest in the business under this Agreement shall constitute a breach of this Agreement and cause for termination of this Agreement.

C. Approval of a proposed transfer of your entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D. Policies in your account (Section XIII. above) will be transferred to an approved transferee.



EXHIBIT A

XVII. TERMINATION OF AGREEMENT:

A. This Agreement will be terminated automatically:

1. On the effective date of any transfer of your entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

2. Upon your death or permanent incapacity;

3. Upon your loss of any required agent license; or

4. Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which your sales location is located or the discontinuation of the sale of insurance in the state.

B. This Agreement may be terminated:

1. At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law. Once written notice of termination has been given by either party, you will, immediately upon request of the Company, cease to act or to represent yourself in any way as an agent or representative of the Company, but you will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to you. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

XVIII. OBLIGATIONS UPON TERMINATION OF AGREEMENT:

Except as otherwise provided in a subsequent agreement between you and the Company, upon termination of this Agreement, you agree that:

A. You will not act or represent yourself in any way as an agent or representative of the Company.

B. You will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C. You will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in your name to the Company or to any party the Company designates, and you will immediately notify the telephone company of any such transfer. You will be responsible for all charges incurred up to the date of execution of the transfer.

D. For a period of one year following termination, you will not solicit the purchase of products or services in competition with those sold by the Company:

1. With respect to any person, company, or organization to whom you or anyone acting on your behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered by you as a result of your status as a Company agent or as a result of your access to confidential information of the Company; or



**EXHIBIT A**

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. You will immediately cease and desist from any and all use of Company service marks and trade names. You will immediately return to the Company all property in your possession or under your control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. You recognize that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. You agree that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur. You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. You recognize and acknowledge that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. You recognize and acknowledge that the foregoing provisions will not prevent you from earning a livelihood and are not an undue restraint on you.

XIX. NOTICE:

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

If to the Company: Allstate Insurance Company
HR
5343 N 16th St. Ste 300
Attention: Phoenix, AZ 85016

If to you: Steve Ehlers
4054 E. Del Rio St.
Gilbert, AZ 85295

or to such other person or address as any party may furnish or designate to the other in writing.

XX. GENERAL PROVISIONS:

A. This Agreement may not be modified except by a written agreement between the Company and you which expressly states that it modifies this Agreement. No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement. No representative of the Company will have authority to modify this Agreement, except as provided in this Section XX. Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.



EXHIBIT A

B. You acknowledge that you have reviewed the Supplement, EA Manual, and Agency Standards and that you have an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agree to be bound by them.

C. References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards, including any changes which may be made from time to time and distributed to you by the Company.

D. You acknowledge that you have read this Allstate R3001S Exclusive Agency Agreement, understand it, and agree to be bound by its terms.

E. The authority granted to you under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by you under Section I.E.

F. The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

G. If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

H. The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term. The obligation of the parties with respect to any such future performance will continue in full force and effect.

I. Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and you any rights under this Agreement.

J. This Agreement, and the obligations or rights hereunder, shall not be assignable by you, except as provided by Section XVI. The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

K. This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

Tracy Rodriguez

(authorized representative)

(date)

YOU

(name)

12/1/09

(date)



**EXHIBIT A**

R3001S
APPENDIX A

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

SAMPLE

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this ____________ day of ________________, __________, by and between ________________________________ (referred to in this Agreement as "Service Provider"), and ________________________________ (referred to in this Agreement as "Agent"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agent to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agent has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agent has employed Service Provider to assist Agent in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agent in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agent in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by the Agent will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agent.

6. Upon the termination of Service Provider's employment by Agent, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.



**EXHIBIT A**

7. For a period of one year following the termination of Service Provider's employment by Agent, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agent, or any person employed by Agent, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which the Agent solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agent, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to the Agent or the Company all property bearing any Company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agent, Service Provider agrees that he/she will not, either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENT | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| (name) | (name) | (authorized representative) |
| (date) | (date) | (date) |

SAMPLE



**EXHIBIT A**

# Exhibit B

Allstate.
You're in good hands.

**Kent Absalonsen**
Attorney
Corporate Litigation

**VIA OVERNIGHT MAIL**

November 1, 2013

Mr. Stephen Ehlers
4094 E. Del Rio Street
Gilbert, AZ 85295

***Re: VIOLATION OF ALLSTATE R3001S EXCLUSIVE AGENCY AGREEMENT***

Dear Mr. Ehlers,

I am writing on behalf of Allstate Insurance Company ("Allstate"). It has come to our attention that since the termination of your Allstate R3001S Exclusive Agency Agreement (the "Agreement") on September 10, 2013, you have been soliciting Allstate customers and inducing or advising Allstate customers to surrender or cancel coverage. Additionally, we have reason to believe that you misappropriated Allstate confidential and proprietary information, including customer names and contact information. Such conduct directly violates not only the terms of your Agreement, but also violates the Arizona Uniform Trade Secrets Act; a copy of your Agreement is enclosed for your reference.

This letter is to advise you that Allstate insists upon your compliance with the restrictive covenants and other contractual obligations in your Agreement. Therefore, demand is made upon you to cease and desist immediately from soliciting Allstate customers, inducing or advising Allstate customers to surrender or cancel coverage, and utilizing misappropriated Allstate confidential and proprietary information. We further demand that you immediately return all such information, including originals and any and all copies of customer names and contact information, to my attention.

A breach of these provisions allows Allstate to withhold any or all remaining termination payments, and to pursue injunctive relief, monetary damages, attorneys' fees and expenses. Allstate is prepared to protect its interests by all available means. I urge that either you or your attorney contact Sharvin Maisuria at (847) 402-1325 or at smait@allstate.com immediately to discuss this matter.

Sincerely,

Kent Absalonsen

Enclosure

cc: Michele Mahon
Patti Cummings

**Allstate Insurance Company**
2775 Sanders Road, A2E, Northbrook, IL 60062-6127 T 847.402.6427 F 847.326.6440 E kabsa@allstate.com

**EXHIBIT B**

Allstate.
You're in good hands.

**Kent Absalonsen**
Attorney
Corporate Litigation

**VIA OVERNIGHT MAIL**

November 1, 2013

Mr. Stephen Ehlers
Insurance AZ
6938 E. Parkway Norte
Mesa, AZ 85212

***Re: VIOLATION OF ALLSTATE R3001S EXCLUSIVE AGENCY AGREEMENT***

Dear Mr. Ehlers,

I am writing on behalf of Allstate Insurance Company ("Allstate"). It has come to our attention that since the termination of your Allstate R3001S Exclusive Agency Agreement (the "Agreement") on September 10, 2013, you have been soliciting Allstate customers and inducing or advising Allstate customers to surrender or cancel coverage. Additionally, we have reason to believe that you misappropriated Allstate confidential and proprietary information, including customer names and contact information. Such conduct directly violates not only the terms of your Agreement, but also violates the Arizona Uniform Trade Secrets Act; a copy of your Agreement is enclosed for your reference.

This letter is to advise you that Allstate insists upon your compliance with the restrictive covenants and other contractual obligations in your Agreement. Therefore, demand is made upon you to cease and desist immediately from soliciting Allstate customers, inducing or advising Allstate customers to surrender or cancel coverage, and utilizing misappropriated Allstate confidential and proprietary information. We further demand that you immediately return all such information, including originals and any and all copies of customer names and contact information, to my attention.

A breach of these provisions allows Allstate to withhold any or all remaining termination payments, and to pursue injunctive relief, monetary damages, attorneys' fees and expenses. Allstate is prepared to protect its interests by all available means. I urge that either you or your attorney contact Sharvin Maisuria at (847) 402-1325 or at smait@allstate.com immediately to discuss this matter.

Sincerely,

Kent Absalonsen

Enclosure

cc: Michele Mahon
Patti Cummings

**Allstate Insurance Company**
2775 Sanders Road, A2E, Northbrook, IL 60062-6127 T 847.402.6427 F 847.326.6440 E kabsa@allstate.com

**EXHIBIT B**

# Exhibit C

131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
fax (312) 460-7000
www.seyfarth.com

(312) 460-5528

shumphrey@seyfarth.com

April 14, 2014

**Via Personal Delivery**
Steven Ehlers
6938 East Parkway Norte #3
Mesa, AZ 85212

**Re: Violation of Allstate R3001S Exclusive Agency Agreement**

Dear Mr. Ehlers:

This law firm serves as litigation counsel to Allstate Insurance Company ("Allstate"). We write to you on behalf of Allstate and so that you may avoid costly litigation that will be initiated against you shortly as a result of your violation of the Allstate R3001S Exclusive Agency Agreement ("the Agreement") you executed on December 1, 2009. As you know, Allstate takes its Agreement and the protection of its confidential information very seriously; and I am providing you with a copy of the Agreement so that there is no confusion over your obligations.

While an Allstate Exclusive Agent, you had access to Allstate's confidential information. As stated in the Agreement, this information includes, but is not limited to:

> business plans of Allstate; information regarding the names, addresses, and ages of policyholders or prospective policyholders of Allstate; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claims information; certain information and matters identified by Allstate as confidential; and any information concerning or relating to the pursuits of Allstate that is not otherwise lawfully available to the public.

Allstate's confidential information has been accumulated by Allstate over time and at great expense. Pursuant to the Agreement, you acknowledged that you would have access to Allstate's confidential information and promised to only use the confidential information while performing services authorized by the Agreement. You also agreed to not disclose Allstate's confidential information to anyone not authorized to receive it, and to not use the confidential information for any improper purpose. Furthermore and upon termination of the Agreement, you agreed to continue treating Allstate's confidential information as confidential, not disclose (either directly or



**EXHIBIT C**

indirectly) the confidential information to any third party, and immediately return all confidential information to Allstate.

In addition, Allstate's customer relationships have been built over many years and from the investment of substantial time and resources. As an Exclusive Agent, you were entrusted with maintaining and growing these relationships, as well as establishing new relationships, for the benefit of Allstate. Consequently, you agreed that, for a period of one year following the termination of the Agreement, you would not solicit the purchase of products or services in competition with those sold by Allstate:

- with respect to any person, company or organization to whom you or anyone acting on your behalf sold insurance or other products or services to on behalf of Allstate and who was a customer of Allstate at the time the Agreement terminated;
- with respect to any person, company or organization who is a customer of Allstate at the time of the termination of your Agreement and whose identity was discovered by you as a result of your status as an Exclusive Agent or as a result of you having access to Allstate's confidential information;
- from any office or business located within one mile of the agency sales location you maintained while an Exclusive Agent.

Your Agreement terminated on September 10, 2013, and you were prohibited from maintaining and/or using Allstate's confidential information at any point in time thereafter. You are also prohibited from soliciting Allstate customers until after September 10, 2014. Yet, Allstate has direct evidence that you are soliciting Allstate customers through the use of Allstate's confidential information. Even more disturbing, you are using the website "www.steveehlersallstate.com" and the email address "steve@steveehlersallstate.com" ("email address") to solicit Allstate customers and to give the appearance that you are still affiliated with Allstate. Your actions not only violate the Agreement, but also statutory and common law prohibiting the improper use of trade secrets and trademarks, unfair competition, tortious interference and breaches of restrictive covenant agreements. Just as important, your actions and conduct will not be tolerated.

Accordingly, the purpose of this letter is to alert you to the fact that Allstate intends to enforce its rights under the Agreement against you, and anyone acting in concert with you, unless you immediately a) stop soliciting Allstate customers, b) cease using the steve@steveehlersallstate.com email address, c) disable the www.steveehlersallstate.com website and d) return all Allstate confidential information in your possession to Allstate. Please contact me on or before April 21, 2014 if you intend to cease your illegal activity and comply with the obligations you owe Allstate. If we do not hear from you by April 21st, we will assume that you have no interest in complying with your obligations and will take the necessary steps to enforce and protect Allstate's rights and confidential information.

In addition, you elected to receive a monthly Termination Payment ("TPP") when the Agreement terminated. TPP is contingent upon you complying with the duties and obligations



**EXHIBIT C**

identified above. As such, your TPP will be suspended if you continue to refused to comply with the duties and obligations you owe Allstate, and refuse to undertake the actions described in the preceding paragraph.

Finally, please know that, should Allstate institute legal action against you, you may be responsible for attorneys' fees and damages incurred by Allstate as a result of you violating the Agreement, misappropriating Allstate confidential information, illegally using Allstate trademarks and disregarding statutory and common law. Moreover, Allstate sends this letter without waiving or prejudicing its rights to pursue all forms of legal relief against you and anyone acting in concert with you. Since Allstate has a dispute with you that may result in litigation, you are directed to ensure that all documents, records, evidence, electronic data and metadata related to these issues are preserved and are not altered, destroyed or compromised in any way, whether in hard copy or in electronic format. This instruction also applies to anyone acting in concert with you, and you are directed to advise them accordingly.

If you would like to discuss this matter further, you or your attorney may contact me at (312) 460-5528.

Very truly yours,

SEYFARTH SHAW LLP

J. Scott Humphrey

Enclosure



**EXHIBIT C**